## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK TERRILL and BRENDA PEREZ, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>IKEA NORTH AMERICA SERVICES LLC, IKEA US RETAIL LLC, IKEA PROPERTY, INC., IKEA HOLDING US INC., INGKA HOLDING OVERSEAS B.V., and INGKA HOLDING B.V.,<br><br>　　　　　　　Defendants. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Patrick Terrill ("Plaintiff Terrill" or "Terrill") and Brenda Perez ("Plaintiff Perez" or "Perez") (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against defendants IKEA North America Services LLC, IKEA US Retail LLC, IKEA Property, Inc., IKEA Holding US Inc., INGKA Holding Overseas B.V., and INGKA Holding B.V. (collectively "IKEA" or "Defendants"), to recover millions of dollars that were unlawfully overcharged to them as a result of price increases imposed by Defendants in response to import tariffs subsequently determined to be unlawful. All allegations regarding Plaintiffs are made on personal knowledge. All other allegations are made on information and belief following an investigation by counsel.

## NATURE OF THE ACTION

1. This class action concerns IKEA's practice of increasing consumer prices due to unlawful tariffs levied by the President pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq. Specifically, IKEA transferred unlawful IEEPA tariff costs onto Plaintiffs and the putative Class, causing them to pay inflated prices.

- 1 -

2.      This dispute centers on IKEA's conduct and public statements, and a fundamental asymmetry embedded in the tariff refund system. Specifically, the importer of record holds the legal right to seek reimbursement from the government for an unlawfully collected tariff. However, the importer frequently functions as little more than a financial conduit. In the typical transaction, the importer advances the tariff payment and recoups that payment by charging consumers elevated prices. Thus, the consumer, in practical and economic terms, is the one who paid the illegal IEEPA tariffs.

3.      Yet, American consumers—like Plaintiffs and the putative Class—who paid these unlawful tariffs have no statutory right of action before the Court of International Trade ("CIT") because the right to pursue a refund for illegal paid tariffs in the CIT belongs to the importer of record—here, IKEA. Accordingly, even though it is the consumer who paid the illegal tariffs, only the importer can collect a refund in the CIT.

4.      Thousands of companies have already filed actions with the CIT seeking recovery of the full amount of their IEEPA tariff obligations, and the CIT has already ordered that refunds (plus interest) be issued to entitled importers regardless of whether the companies filed a lawsuit with the CIT. *Atmus Filtration, Inc. v. U.S.*, No. 26-01259, Order at 1 (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21. Furthermore, on April 20, 2026, U.S. Customs and Border Protection ("CBP") released a Consolidated Administration and Processing of Entries (CAPE) functionality within the Automated Commercial Environment (ACE) that allows for the processing of tariff refund requests to the importer of record. This dynamic exists notwithstanding Goldman Sachs' estimates that U.S. consumers are "shouldering two-thirds of President Trump's new tariff costs."

5.      This lawsuit seeks to ensure that Plaintiffs and the putative Class recover monetary damages for the unlawful tariff overcharges they paid pursuant to the illegal IEEPA tariffs. Accordingly, Plaintiffs seek monetary damages in the amount of the unlawful IEEPA duties passed

through to Plaintiffs and the putative Class in the form of elevated product prices. Plaintiffs and the Class are also entitled to pre- and post-judgment interest, reasonable attorneys' fees, and costs.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are more than $5,000,000.00 in the aggregate, exclusive of interest and costs.

7.      The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, at all times relevant to the Complaint, Defendants' U.S. headquarters are in this District. Defendants also transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

9.      This Court has personal jurisdiction over Defendants because, *inter alia*, IKEA: (a) transacted business throughout the U.S., including in this District; (b) offered consumer products to Plaintiffs and the putative Class throughout the U.S., including in this District; (c) had substantial contacts with the U.S., including in this District; or (d) engaged in conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the U.S., including in this District.

10. The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the U.S.

## PARTIES

### A. Plaintiffs.

11. **Plaintiff Patrick Terrill** is a natural person and individual consumer who, at all times material hereto, was a citizen of California. Plaintiff Terrill purchased IKEA products through IKEA's website, that upon information and belief, was impacted by the unlawful IEEPA tariffs. Upon information and belief, absent the illegal price increases implemented by IKEA in response to the unlawful IEEPA tariffs, Plaintiff Terrill would have paid less for these products.

12. **Plaintiff Brenda Perez** is a natural person and individual consumer who, at all times material hereto, was a citizen of California. Plaintiff Perez purchased IKEA products on IKEA's website, that upon information and belief, was impacted by the unlawful IEEPA tariffs. Upon information and belief, absent the illegal price increases implemented by IKEA in response to the unlawful IEEPA tariffs, Plaintiff Perez would have paid less for these products.

### B. Defendants.

13. Defendant **IKEA North America Services, LLC**, is a Delaware corporation with its U.S. headquarters and principal place of business at 420 Alan Wood Rd., Conshohocken, PA 19428. Among other things, Defendant IKEA North America Services LLC operates the IKEA website in the U.S. On information and belief, IKEA North America Services LLC is one of the entities entitled to tariff refunds as the importer of record of IKEA's goods and products.

14. Defendant **IKEA US Retail LLC** is a Delaware corporation with its U.S. headquarters and principal place of business at 420 Alan Wood Rd., Conshohocken, PA 19428. Defendant IKEA US Retail LLC is the sole member of IKEA North America Services, LLC. On

information and belief, IKEA US Retail LLC is another entity entitled to tariff refunds as the importer of record of IKEA's goods and products.

15. Defendant **IKEA Property, Inc.** is a Delaware corporation with its U.S. headquarters and principal place of business at 420 Alan Wood Rd., Conshohocken, PA 19428. IKEA Property, Inc. is the sole member of IKEA US Retail LLC and is a wholly owned subsidiary of Defendant IKEA Holding US Inc.

16. Defendant **IKEA Holding US Inc.** is a Delaware corporation with its U.S. headquarters and principal place of business at 420 Alan Wood Rd., Conshohocken, PA 19428. Defendant IKEA Holding US Inc. is a subsidiary of INGKA Holding Overseas B.V.

17. Defendant **INGKA Holding Overseas B.V.** is a Dutch corporation incorporated in the Netherlands with its headquarters at Bargelaan 20, 2333CT, Leiden, Netherlands. Defendant INGKA Holding Overseas B.V. is a subsidiary of INGKA Holding B.V.

18. Defendant **INGKA Holding B.V.** is a Dutch corporation incorporated in the Netherlands. It is the largest owner of IKEA franchisees, representing around 87 percent of total IKEA sales. As of August 31, 2025, Ingka Group operated 411 IKEA stores, in 32 countries.

## FACTUAL ALLEGATIONS

19. IKEA is a multinational conglomerate founded in Sweden that designs and sells ready-to-assemble furniture, household goods, and multiple various other related services. Since 2008, it has been the world's largest furniture retailer.

20. In the U.S., IKEA operates approximately 55 stores and reported $5.3 billion in total sales with nearly 61 million in-person visitors and 467 million online visitors.

21. Approximately 85 percent of IKEA's goods are produced outside of the U.S., with 30 percent produced in Asia, mostly in China, and the remaining 70 precent manufactured in Europe.

## I.      Overview of the IEEPA Tariffs.

22.     During the 2024 election campaign, then-candidate Trump vowed to correct trade imbalances and protect U.S. industries by imposing steep tariffs on foreign-made goods. Mr. Trump repeated these vows later as the president-elect. Speaking to CNN in the wake of the 2024 presidential election, Jesper Brodin, the Chief Executive Officer of INGKA Holding B.V., the largest IKEA franchisee, warned that "[i]n general, we don't believe tariffs will support international companies and international trade. *At the end of the day, that risks ending up on the bills of customers*. Tariffs make it more difficult for us to maintain the low prices and be affordable for many people, which in the end is our goal."

23.     Following the President's inauguration in January 2025, businesses around the world began to brace themselves for the imposition of tariffs. At the World Economic Forum annual meeting in Davos, Switzerland, Mr. Brodin again warned of the effect of tariffs on consumers, noting that "at the end of the day there is a risk in any country with tariffs *that you need to, as a company, pass it on to the customers*."

24.     Weeks later, in February 2025, President Trump began issuing a series of executive orders to impose tariffs on goods imported from most foreign countries, including Canada, Mexico, China, and other U.S. trading partners. The executive orders were premised on the IEEPA's authorization because of a purported national emergency over the U.S. trade deficit.

25.     Under the authority of IEEPA, President Trump imposed tariffs as high as 145 percent from China, and a baseline 10 percent tariff on nearly all imports to the U.S. Importantly for IKEA, by April of 2025 those tariffs included a 15% tariff on goods imported from the European Union and 20% on goods imported from Vietnam, two other major sourcing hubs for IKEA.

26.     On February 20, 2026, the U.S. Supreme Court invalidated all IEEPA-based tariffs. *Learning Resources, Inc. v. Trump*, 607 U.S. ____ (2026) (slip op. at 20).

27.     President Trump subsequently issued an Executive Order terminating the IEEPA Tariffs.

28.     On February 22, 2026, CBP, the federal entity responsible for collecting foreign duties, issued CSMS #67834313, announcing that it would halt the collection of all duties imposed pursuant to IEEPA at 12:00 a.m. E.T. on February 24, 2026.

29.     While the IEEPA tariffs were in place, CBP collected $30 billion in duty revenue in January 2026 alone, and more than $124 billion in total, the overwhelming majority of which was passed on to American consumers in the form of higher prices.

## II.     IKEA's Response to the IEEPA Tariffs

30.     IKEA's low-cost furniture has won it legions of fans around the world. The Swedish brand had even slashed the prices of its bookshelves and bed frames in recent years, as part of a conscious effort to woo shoppers after a period of rampant inflation. But IEEPA tariffs required a change of tack.

31.     IKEA is a major importer of consumer goods into the U.S. Most of its products, approximately 85 percent, are manufactured abroad and imported into the U.S. Of these, approximately 30 percent of IKEA's goods are produced in Asia, mostly in China, with the remaining 70 precent manufactured in Europe. In total, IKEA generates more than $5 billion in sales on these goods in the U.S. each year.

32.     Throughout the Class Period, IKEA paid IEEPA tariffs to the CBP. IKEA passed on the tariff burden to consumers in the form of higher prices. In June 2025, Tolga Öncü, INGKA Retail Manager at INGKA Group, the company that operates most of the IKEA stores around the world, told CNBC that due to the IEEPA tariffs, IKEA had ***already*** increased prices, passing on

some of the impact of those tariffs to Plaintiffs and the putative Class. This news was an about face from March 2024, when the Company had announced it was going to continue to cut prices in the U.S. as inflationary pressures eased.

33.    In the ensuing months, IKEA continued to increase prices on products to offset costs related to the illegal IEEPA tariffs. For example, the price of its certain sofas, like the Uppland sofa, rose $50 in August 2025, according to archived internet pages, while the cost of bedroom sets, like a three-piece oak bedroom set, rose $100 in July 2025.

34.    Numerous Reddit threads during this time detail IKEA customers' surprise and frustration at sudden price increase that were purportedly due to tariffs. For example, in one thread, a user remarked how the Vesken Cart went from $10.66 to $17.99, an increase of 80 percent, in just one week. The post moderator replied, noting that tariffs "can flow through to retail prices."

35.    While IKEA representatives remained opaque as to the extent and depth of the tariff related price hikes, the unlawful price increases purportedly have been corroborated by first-hand accounts from IKEA purchasers. For example, in a September Reddit thread, a user commented: "Just got back from IKEA and bought an Ekenasat chair. Tag said 279 but rang up to 329. I took photo of the chair in the showroom and they refunded the 50 difference and said their prices were changing. Tariffs are hitting big time!" Another user commented, "Yep, I (U.S.) was looking to buy a SKRUVBY and it went from $149 to $199." Meanwhile a Canadian user commented, "No major price changes I can see in CA. Must be an American woe."

36.    A December reddit thread suggests prices continued to rise even higher with one user commenting, "The corner cover for my Soderhamn couch cost $100 and had it in my cart as I wanted to have as an extra in case it got discontinued. The price is now $150." Another noted, "Was going to get a lamp that cost $79, 2 weeks later it was $99. Ridiculous..." And yet another

user complained, "Our Tobias chairs went from 89.00 to 115.00. Avoid those. The Vesken Cart went from 9.99 to 18.00 lol! Skip that too."

37.     The anecdotal redditor comments are supported by Plaintiffs' experiences, which illustrate IKEA's unlawful tariff-driven price increases. For example, Plaintiff Terrill purchased RUNNEN Acacia decking material on three occasions in the summer of 2025 at IKEA's then-advertised price of $29.99 per lot. The price of the same RUNNEN Acacia decking material rose to $34.99 per lot by November 18, 2025—the price Plaintiff Terrill paid when he purchased the product again on March 1, 2026, reflecting a $5.00 per unit increase attributable to IKEA's tariff pass-through.

38.     Plaintiff Perez's December 27, 2025, purchases reflect similar across-the-board price increases. Perez purchased a Hyllis Shelf Unit ($29.99), an Akerbar Greenhouse ($29.99), multiple Rodalm Frames ($5.99), a Vardtrad Plant Pot 4¾ in. ($6.99), and multiple Vardtrad Plant Pots 3½ in. ($5.99). Upon information and belief, each of these prices was elevated as a result of IKEA's tariff pass-through: the Rodalm Frame had been priced at $3.99 in January 2025; the Akerbar Greenhouse at $22.99 in March 2025; the Hyllis Shelf Unit at $24.99 in April 2025; and the two Vardtrad Plant Pots at $3.99 and $5.99, respectively, earlier in 2025 — reflecting increases ranging from $2.00 to $7.00 per item by the time of Perez's purchase.

39.     Thus, as a direct result of IKEA's tariff pass-through pricing, Plaintiffs and the putative Class have paid more for tariffed goods than they would have absent the unlawful IEEPA tariffs-related price increases.

## III.     Anticipated Tariff Refunds.

40.     In the wake of the Supreme Court's decision in *Learning Resources*, thousands of importers filed cases in the CIT to recover tariff refunds from the government. On March 4, 2026, Judge Richard Eaton ruled that "all importers of record" were "entitled to benefit" from the

Supreme Court's ruling that struck down the IEEPA tariffs. *Atmus Filtration, Inc. v. United States*, No. 26-01259, Order at 1 (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21. The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties." *Id*. at 2–3.

41.     According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion. *Atmus*, ECF No. 31 at 6.

42.     On April 20, 2026, in response to the *Atmus* decision, United States Customs and Border Protection released a Consolidated Administration and Processing of Entries (CAPE) functionality within the Automated Commercial Environment (ACE) that allows for the processing of tariff refund requests.

43.     However, those refunds (plus interest) only may be issued to entitled importers of record, notwithstanding the fact that U.S. consumers are "shoulder[ed] two-thirds of President Trump's new tariff costs." As a result, this lawsuit seeks to ensure that Plaintiffs and the putative Class recover monetary damages for the unlawful tariff overcharges they paid pursuant to the illegal IEEPA tariffs.

## CLASS ALLEGATIONS

44.     Plaintiffs purchased Defendants' products at an inflated price due to illegal tariffs. Plaintiffs bring this action on behalf of themselves and those similarly situated to recover money wrongfully collected and to obtain appropriate relief, as permitted by law.

45.     The relevant class is defined as:

> All persons in the United States who purchased IKEA products at inflated prices charged by IKEA because of the unlawful IEEPA tariffs.

46.     Excluded from the Class are Defendants, Defendants' subsidiaries, parents, successors, predecessors, and their officers, directors, affiliates, legal representatives, and employees, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

47.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

48.     **Numerosity:** At this time, Plaintiffs do not know the exact number of Class Members. However, upon information and belief, Plaintiffs estimate this number to be in the thousands, and therefore, the number of Class Members is so numerous that joinder of all members is impracticable. Class Members can be easily identified through Defendants' records, discovery and self-identification.

49.     **Commonality/Predominance:** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class Members predominate over questions that may affect individual Class Members, and include:

a.     Whether Defendants passed on IEEPA tariff-related charges to Plaintiffs and the putative Class;

b.     The amount to which Plaintiffs and the putative Class were overcharged for products because of the illegal tariffs;

c.     Whether Defendants retention of Plaintiffs' and the putative Class's payments used for illegal tariff costs is unjust;

d.     Whether Defendants acted unfairly or deceptively by charging Plaintiffs and the putative Class for illegal tariff costs; and

- 11 -

e. Whether Plaintiffs and the putative Class are entitled to damages in the form of the amounts paid in increased prices that were attributable to the illegal tariffs.

50. **Typicality:** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, sustained damages arising from Defendants' wrongful conduct.

51. **Adequate Representation:** Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel that is experienced in litigating complex consumer protection class actions. Plaintiffs' counsel has the financial and legal resources to vigorously prosecute this action. Plaintiffs have no interests which conflict with those of the Class.

52. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The harm suffered by individual class members is likely small compared to the burden of litigating this matter to redress the harm caused by Defendants' wrongful conduct. The prerequisites to maintaining a class action are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate damages with respect to the Class as a whole. The interests of justice would be well served by resolving the common disputes of potential Class members in one forum. A class action provides economies of scale and of time, effort and expense. This action is manageable as a class action.

53. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might find Plaintiffs are entitled to reimbursement, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

## CLAIMS FOR RELIEF

### COUNT I
### PENNSYLVANIA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW, 73 P.S. §§201

54.     Plaintiffs incorporate by reference the facts alleged above.

55.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201, makes it unlawful to engage in unfair or deceptive acts or practices in connection with trade or commerce.

56.     As alleged herein, Defendants engaged in unfair and deceptive trade practices in connection with trade or commerce by charging Plaintiffs and putative Class Members unlawfully increased prices for the goods and products sold in its stores due to IEEPA duties it purportedly owed to the U.S. government, which were later found to have been illegal.

57.     As alleged herein, Defendants' shifting of those illegal tariff costs to consumers via increased prices is an unfair, deceptive, and/or unconscionable act under 73 P.S. §§201. Plaintiffs and the members of the proposed Class paid more than the value they received.

58.     Defendants' unfair, deceptive, and/or unconscionable conduct was a substantial factor and proximate cause of Plaintiffs' and the Class's injuries.

59.     As a result of Defendants' violations of 73 P.S. §§201, Plaintiffs and the Class seek all available damages, in addition to reasonable attorneys' fees and costs, and any such other relief the Court may deem necessary to prevent Defendants from engaging in unlawful conduct.

### COUNT II
### UNJUST ENRICHMENT
### On Behalf of Plaintiffs and the Class Against All Defendants

60.     Plaintiffs incorporate the foregoing allegations in paragraphs 1 to 53 of this complaint as if fully set forth herein.

61.     Defendants unlawfully increased prices on consumer products purchased by Plaintiffs and the putative Class due to unlawful tariffs imposed by the Trump Administration under the IEEPA.

62.     Plaintiffs and Class Members conferred a benefit upon Defendants when paying these unlawful increased prices to Defendants due to illegal import tariffs.

63.     Defendants appreciated or had knowledge of the benefits they received from Plaintiffs and Class Members.

64.     It would be unjust for Defendants to retain tariff surcharges in the form of increased prices to cover the expense of the subject tariffs because those tariffs were illegal. If Plaintiffs and the putative Class had known that the costs for the products purchased were unlawfully higher due to illegal tariffs, then Plaintiffs and the putative Class would have expected remuneration from Defendants.

65.     Defendants' unjust conduct was the proximate cause, and a substantial factor, in causing Plaintiffs and the members of the proposed Class's losses and damages.

66.     Defendants should not be permitted to retain the costs passed on to Plaintiffs and the putative Class in the form of higher prices as a result of the illegal tariffs, the exact amount of which will be proven at trial.

**COUNT III**
**MONEY HAD AND RECEIVED**
**On Behalf of Plaintiffs and the Class Against All Defendants**

67.     Plaintiffs incorporate the foregoing allegations in paragraphs 1 to 53 of this complaint as if fully set forth herein.

68.     IKEA increased prices for the purpose of repaying itself for the IEEPA tariffs it had advanced, as the importer of record, to CBP as duties on imported goods.

- 14 -

69. The Supreme Court has since determined that those tariffs lacked the requisite statutory authorization.

70. The money that consumers paid above and beyond what they would have paid absent the IEEPA tariffs belonged to Plaintiffs and to each putative Class Member.

71. Defendants have not returned the money.

72. IKEA should not be permitted to retain the funds Plaintiffs and the putative Class paid above and beyond what they would have absent the IEEPA tariffs. The money, the amount of which will be proven at trial, belongs to Plaintiffs and the putative Class, and IKEA is obligated to return it. Restated, IKEA received money from Plaintiffs and from each putative Class Member in the form of higher prices, proximately caused by the pass-through of IEEPA tariff costs.

73. Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to him.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel;

B. For an order declaring that Defendants' conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and

expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: April 27, 2026                      Respectfully submitted,

By:      /s/ *Jonathan Shub*
         Jonathan Shub (PA Bar No. 53965)
         Benjamin F. Johns (PA Bar No. 201373)
         **SHUB, JOHNS & HOLBROOK LLP**
         Four Tower Bridge
         200 Barr Harbor Drive, Suite 400
         Conshohocken, PA 19428
         T: (610) 477-8380
         jshub@shublawyers.com
         bjohns@shublawyer.com

         **KAPLAN FOX & KILSHEIMER LLP**
         Frederic S. Fox (*Pro Hac Vice* forthcoming)
         Donald R. Hall (*Pro Hac Vice* forthcoming)
         Hae Sung Nam (*Pro Hac Vice* forthcoming)
         Aaron Schwartz (PA Bar No. 319615)
         800 Third Avenue, 38th Floor
         New York, NY 10022
         T: 212-687-1980
         FFox@kaplanfox.com
         DHall@kaplanfox.com
         HNam@kaplanfox.com
         ASchwartz@kaplanfox.com

         Laurence D. King (*Pro Hac Vice* forthcoming)
         1999 Harrison Street, Suite 1501
         Oakland, CA 94612
         T: 415-772-4700
         F: 415-772-4707
         lking@kaplanfox.com

         *Attorneys for Proposed Lead Plaintiffs Patrick*
         *Terrill and Brenda Perez*